Marc P. Berger
Sanjay Wadhwa
Steven G. Rawlings
Todd Brody
Megan R. Genet
Hane L. Kim
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Phone:  (212) 336-0080 (Brody)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | 18 CV ____ (___) |
| -against- | Jury Trial Demanded |
| BRIAN WEBER and BEBIDA BEVERAGE CO., | |
| **Defendants.** | |

# COMPLAINT

Plaintiff Securities and Exchange Commission, for its Complaint against defendants Brian Weber ("Weber") and Bebida Beverage Co. ("Bebida") (together, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. From January 2014 through December 2015, Bebida, by and through its CEO and President Weber, engaged in a three-pronged scheme for the purpose of unlawfully generating cash to support its failing business operations and for Weber's benefit. Each part of the scheme

involved Weber deceiving Bebida's transfer agent (the "Transfer Agent") and the public, in violation of the federal securities laws.

2.  First, Weber fabricated a convertible note, which resulted in restricted shares of Bebida being issued and sold on the open market.

3.  Second, Weber artificially inflated the number of Bebida shares outstanding to avoid certain affiliate limitations of Rule 144 of the Securities Act of 1933 ("Securities Act") [17 C.F.R. § 230.144], and then issued false press releases touting the cancellation of these shares, artificially inflating the share price.

4.  Finally, Weber fabricated transactions relating to other sham convertible debt to acquire money.

5.  Weber unlawfully generated at least $208,000 through this scheme.

**VIOLATIONS**

6.  By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.  Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

8.  The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15

U.S.C. § 78u(d)(1)], seeking to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.

9.  The Commission also seeks a final judgment: (a) permanently enjoining the Defendants from future violations of the securities laws provisions that the Defendants violated as alleged in this Complaint; (b) ordering the Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; (c) imposing civil money penalties on the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) imposing an officer-and-director bar on Weber pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and imposing a penny stock bar on Weber pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## JURISDICTION AND VENUE

10.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The Defendants, either directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

11.  Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of

business alleged in this complaint occurred within the Eastern District of New York, including the issuance of certificates for common shares of Bebida by the Brooklyn-based Transfer Agent, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.

**DEFENDANTS**

12.     **Weber**, age 51, resides in Cornelius, North Carolina.  Weber assumed control of Bebida in April 2009 and served as its President and CEO until at least June 2017.

13.     **Bebida** is a Wyoming corporation incorporated in November 2008 with its principal place of business in Mooresville, North Carolina.  In that same month, a publicly traded shell company, Renovo Holdings, a Nevada corporation, based in Florida, changed its name to Bebida Beverage Company ("Bebida Nevada").  Renovo was a publicly traded reporting company until August 2008 at which time it filed a Form 15 with the Commission, terminating its registration under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  Bebida and Bebida Nevada merged in November 2009, with Bebida as the surviving corporation.  From 2009 to on or around June 2017, Weber owned all of the preferred stock of Bebida, giving him control over the company, and was its CEO and President.  Bebida has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act, and it does not file periodic reports under Section 13(a) or 15(d) of the Exchange Act [15 U.S.C. § 78m(a) or § 78o(d), respectively].  Its common stock is quoted on OTC Link (formerly "Pink Sheets") operated by OTC Markets Group, Inc.

## RELATED ENTITIES

14. **DLR Associates, LLC** ("DLR") was first incorporated in Delaware in January 2007 by Weber and another individual. Later, Weber reincorporated DLR in Wyoming in May 2012 ("DLR Wyoming"). A privately held limited liability company, DLR owned all the registered trademarks for the brands developed, manufactured and marketed by Bebida.

15. **Warmick International, Inc.** ("Warmick") is a Wyoming corporation incorporated in August 2011 with its principal place of business at Bebida's former headquarters in Statesville, North Carolina. At the time of incorporation, Warmick's sole director was Weber. In early 2015, Individual A became the President and sole member of Warmick.

## FACTS

16. In or around 2003, Weber began to develop energy drinks and later, relaxation drinks, targeting the Latin American market. In November 2009, Bebida became a public company through a name change of a publicly traded shell company. As Bebida failed to generate sufficient cash flow, Weber employed a series of fraudulent schemes to acquire money, in violation of the federal securities laws.

### A. Weber Fabricated a Note to Convert to Shares

17. In January 2007, Weber and another individual incorporated DLR to hold the trademarks for the various energy and relaxation drinks they created. From at least May 2012 to January 2015, Weber was the CEO of DLR. On January 26, 2015, Weber removed himself as an officer of DLR and added Individual A—whom Weber regarded as a son and who had only a high school education and no background in securities—as President.

18. In August 2011, Weber incorporated Warmick, and was its sole director, and by June 2014, Weber was listed as its President. But on or before January 7, 2015, Individual A became the President.

19. On January 5, 2015, two days before Individual A was listed as President of Warmick, Weber created a Secured Convertible Debenture (the "DLR Convertible Debt") purportedly issued by Bebida to DLR on October 22, 2012, in the amount of $180,000, due October 22, 2013. The DLR Convertible Debt was a fictitious instrument—it did not exist before January 5, 2015 and DLR never loaned Bebida $180,000.

20. From January 7, 2015 through November 30, 2015, $45,475 of this purported $180,000 DLR Convertible Debt was assigned to Warmick in ten separate assignments (the "DLR-Warmick Assignments"). With each assignment, Weber almost immediately submitted documentation to an attorney seeking an attorney opinion letter opining that the assigned debt could be converted into common shares issued to Warmick without restricted legend pursuant to Rule 144. The following representations, among others, were to be the basis for such opinion letters: (1) the DLR Convertible Debt was a true debt Bebida owed to DLR; (2) the DLR Convertible Debt was issued on October 22, 2012; (3) DLR was not an affiliate of Bebida; (4) Warmick was not an affiliate of Bebida; and (5) Warmick was not selling on behalf of an affiliate. The documentation generally included fraudulent evidence of purported DLR loan and disbursement requests directing payment of DLR by Warmick for the portion of debt assigned (although no attendant actual proof of payment existed).

21. After the attorney opinion letter was issued, Weber submitted the letter and supporting documents to the Transfer Agent, which issued certificates for common shares of Bebida without restricted legend. Weber then directed Individual A to deposit these shares into

6

Warmick's brokerage accounts and to sell the shares; the shares were sold in a matter of weeks after the purported debt assignment. Individual A sent at least $165,542.90 of the total $195,039.43 (or nearly 85%) in gross proceeds from the sale of the Bebida common stock back to Bebida, further indicating that Weber and Bebida, not Individual A and Warmick, were the true beneficial holders of the stock resulting from the assignments of the DLR Convertible Note to Warmick.

      **B.**      **Weber Fabricated a Debt Paid by Shares**

22. On or about December 30, 2014, Bebida executed a 100:1 reverse stock split, reducing the issued and outstanding shares by a factor of 100. Bebida issued a press release quoting Weber as stating that the reverse split was "part of an overall long term initiative to send a clear message to the market that we are aggressively taking steps to end stock delusion (sic) and begin the tedious stock buy-back process." One consequence of the reverse split was that the number of shares a person could hold before being deemed an affiliate was also reduced by a factor of 100. This meant that holders of convertible debt could convert a far smaller number of shares at any one time before being deemed affiliates. This limitation resulted in higher expenses to Bebida because it had agreed to pay certain fixed costs associated with stock conversions by holders of Bebida convertible debt.

23. To avoid paying these costs, Weber fraudulently increased the number of issued and outstanding Bebida shares. This correspondingly increased the number of shares that holders of Bebida convertible debt could convert into common shares at one time without being deemed affiliates. On April 13, 2015, Weber issued 350 million shares to an unincorporated entity called First Beverage Investment LLC ("First Beverage"), purportedly in exchange for a working capital loan in the amount of $200,000 (the "First Beverage Issuance"). First Beverage

7

did not exist, and no such loan was made.  Then, as convertible debt issuances of Bebida common stock were made—causing the issued and outstanding Bebida common stock to rise—Weber "retired" the sham stock, i.e. Weber voted to cancel the shares at a board meeting where only he was present and then instructed the Transfer Agent to reduce the stock certificate issued to First Beverage and return the cancelled shares to Bebida.

24. For example, on May 12, 135 million shares of Bebida common stock were issued to convertible debt holders, including Warmick; on the same day, Weber cancelled 130 million shares that had been issued to First Beverage.  This pattern continued until Weber cancelled all the First Beverage shares.  Weber's scheme saved Bebida approximately $3,000 in fees to attorneys and the Transfer Agent.

25. Both Bebida's Quarterly Report for the period ending June 30, 2015 (the "Quarterly Report"), filed on September 29, 2015 and certified by Weber as CEO of Bebida, and Supplemental Information filing for the period ending September 30, 2015 (the "Supplemental Filing"), filed on October 1, 2015, materially misrepresented the First Beverage Issuance.  The Quarterly Report identified the First Beverage Issuance as a capitalization whereas, in truth, First Beverage provided no capital.  The Supplemental Filing similarly falsely stated that the First Beverage Issuance was "for collateral in an Investment proposition," even though First Beverage offered no "Investment proposition."

26. Further, on at least two occasions, Bebida, by and through Weber, publicized the cancellation of the First Beverage shares through false press releases (collectively, the "Press Releases").  The Press Releases created the false impression that Bebida had repurchased the shares and that these repurchases were an indication that Bebida was in the process of buying back its stock from shareholders.

27.     The first press release, issued on May 12, 2015, reported that Bebida purportedly had "recovered and retired nearly 10 percent of the company's current issued and outstanding stock," in reference to the cancellation on that day of 75 million shares that had been issued to First Beverage.  The second press release, issued on June 9, 2015, reported that Bebida purportedly had "recovered and retired 43,000,000 of the company's current issued and outstanding stock."  Both press releases quoted Weber as saying, "I am optimistic that our buy back will bring our stock price and OTC Markets view back into true focus and the loyal and long term investors have their day."  Bebida, in fact, paid no money to redeem the shares.

28.     The stock price of Bebida's common shares increased dramatically on the day of each press release.  On May 11, 2015, Bebida's common stock had a high of $.0005/share and a closing price of $.0002/share.  On May 12, 2015, after the first press release, the stock price had a high of $.0011/share, a 120% increase over the previous day's high, and a closing price of $.0007/share, a 250% increase over the previous day's closing price.  On June 8, 2015 Bebida's common stock had closed at a high price of $.0005/share.  On June 9, 2015, after the second press release, the stock price had a high of $.0017/share, a 240% increase over the previous day's high, and a closing price of $.0006/share, a 20% increase over the previous day's closing price.

29.     At and around the time the Press Releases were issued, Warmick, at Weber's direction, sold shares of Bebida's common stock at the inflated prices.

        C.     **Weber Sold Additional Fabricated Notes**

30.     In December 2013 and October 2014, Weber fabricated two aged notes receivable, convertible into Bebida stock:  a $100,000 convertible note purportedly issued on April 25, 2014 and a $200,000 convertible note purportedly issued on June 22, 2012.  Shortly after creating these Notes, Weber arranged their sale to Investor A for $40,000, paid by two

9

checks of $20,000 each. On the first check, dated January 16, 2014, Weber handwrote "+ Bebevco Holdings Inc"; on the second check, dated October 5, 2014, Weber handwrote "+ Brian Weber." In each case, Weber then deposited the checks into bank accounts he controlled.

31. From January 2014 to June 2015, Investor A converted the debt into common stock, ultimately holding over 940 million shares, and from January 2015 to September 2015, Investor A sold over 160 million shares of Bebida common stock to the public generating approximately $61,000 in proceeds.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and (c) of the Securities Act
### (Both Defendants)

32. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 31, as if fully set forth herein.

33. The Defendants, directly or indirectly, and notwithstanding the fact that there was no applicable exemption: (a) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means and instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed. No valid registration statement was filed with the Commission or in effect with respect to Weber's or Bebida's sales of, and offers to sell, securities in Bebida.

34. The Defendants made offers of securities in the United States and sold securities in the United States in that: (a) sales were executed by broker-dealer firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to sales passed in the United States.

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Both Defendants)**

35. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 31, as if fully set forth herein.

36. The Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

37. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Both Defendants)**

38. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 31, as if fully set forth herein.

39. The Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

40. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that the Defendants each violated Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as alleged in this Complaint;

### II.

Permanently enjoining the Defendants, their agents, servants, employees, attorneys-in-fact and assigns, and those persons in active concert or participation with them or who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q(a)], and Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as alleged in this Complaint;

**III.**

Ordering each of the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts;

**IV.**

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Imposing an officer-and-director bar on Weber pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VI.**

Imposing a penny stock bar on Weber pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

**VII.**

Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, NY
       September 5, 2018

                              Respectfully submitted,

By: *[signature]*
      Marc P. Berger
      Sanjay Wadhwa
      Steven G. Rawlings
      Todd Brody
      Megan R. Genet
      Hane L. Kim
      *Attorneys for Plaintiff*
      Securities and Exchange Commission
      New York Regional Office
      200 Vesey Street, Suite 400
      New York, NY 10281-1022
      Tel: (212) 336-0080 (Brody)