UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

    -against-

BRIAN WEBER, *et al.*,

                 Defendants.
-------------------------------------------------------X

REPORT AND
RECOMMENDATION

18 CV 5019 (DLI) (RML)

LEVY, United States Magistrate Judge:

        By order dated January 6, 2020, the Honorable Dora L. Irizarry, United States District Judge, referred plaintiff's motion for default judgment against defendant Bebida Beverage Co. ("Bebida") to me for report and recommendation. For the reasons stated below, I respectfully recommend that plaintiff's motion be granted and that its request for disgorgement, prejudgment interest, civil penalty, and a permanent injunction be approved.

## BACKGROUND AND FACTS

        Plaintiff Securities and Exchange Commission ("plaintiff" or the "SEC") commenced this action on September 5, 2018, asserting violations of the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq. (the "Securities Act"), the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq. (the "Exchange Act" and, together with the Securities Act, the "Acts"), and rules promulgated thereunder. (See Complaint, dated Sept. 5, 2018 ("Compl."), Dkt. No. 1.) The complaint alleges that from January 2014 through December 2015, Bebida, a Wyoming corporation acting through its CEO, President, and controlling shareholder Brian Weber ("Weber") (together with Bebida, "defendants"), engaged in an unlawful scheme for the purpose of generating cash to support Bebida's failing business operations. (Id. ¶ 1.)

On October 9, 2018, plaintiff personally served Bebida's authorized and registered agent for service, Business Filings International, Inc. (Return of Service, dated Oct. 9, 2019, Dkt. No. 13-1). On February 11, 2019, the Clerk of the Court entered default against Bebida. (Clerk's Certificate of Default, dated Feb. 11, 2019, Dkt. No. 14.) To date, Bebida has not answered or otherwise moved with respect to the complaint.

Bebida was a company that developed energy and relaxation drinks targeting the Latin American market. (Compl. ¶ 16.) From 2009 to June 2017, Weber was the CEO and President of Bebida and owned all of the preferred stock of the company, giving him control over the company. (Id. ¶¶ 12-13). Bebida has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act, and it has not filed periodic reports under Section 13(a) or 15(d) of the Exchange Act, 15 U.S.C. § 78m(a) or § 78o(d). (Id. ¶ 13).

As Bebida failed to generate sufficient cash flow, defendants allegedly employed a series of fraudulent schemes to acquire money, in violation of the federal securities laws. (Id. ¶ 1). First, defendants allegedly fabricated a convertible note, which resulted in restricted shares of Bebida being issued and sold on the open market. (Id. ¶ 2.) Second, defendants artificially inflated the number of Bebida shares outstanding to avoid certain affiliate limitations of Rule 144 of the Securities Act, 17 C.F.R. § 230.144, and then issued false press releases touting the cancellation of these shares, artificially and materially inflating the share price. (Id. ¶ 3.) Finally, defendants allegedly fabricated two additional convertible debt instruments, which they then sold to an investor at a deep discount to par, resulting in 160 million restricted shares of Bebida being issued and sold on the open market. (See Compl. ¶¶ 4, 19-20.)

On October 25, 2018, the court entered a consent judgment against Weber,

finding that Weber was liable for disgorgement of $208,000, representing the profits gained as a result of the conduct alleged in the complaint, together with prejudgment interest in the amount of $23,436.56.  (Consent Judgment, dated Oct. 25, 2018 ("Consent Judgment"), Dkt. No. 11).  The consent judgment stated that Weber's liability would be joint and several with that of Bebida should Bebida also be ordered to pay disgorgement and prejudgment interest.  (Id.)  Weber was also ordered to pay a civil penalty of $160,000.  (Id.)  The order required Weber to satisfy these obligations within fourteen days after entry of judgment.  (Id.)  To date, Weber has not paid any of the outstanding monetary judgment against him.  (Declaration of Megan R. Genet, Esq., dated Dec. 23, 2019 ("Genet Decl."), Dkt. No. 17, ¶ 6).

Bebida is no longer in operation.  (See id. ¶¶ 17-26.)  Nonetheless, plaintiff argues that "it is critical that the Court also enter relief against the corporate entity as the [SEC] is concerned that, without such relief, the entity will be used as a vehicle for additional fraudulent conduct."  (Memorandum of Law in Support of Default Judgment against Bebida Beverage Co., dated Dec. 23, 2019 ("Pl.'s Mem."), Dkt. No. 16, at 1.)  The SEC requests an order of disgorgement of ill-gotten gains, plus prejudgment interest, as well as a permanent injunction enjoining Bebida from further violations of the federal securities laws.  (Id. at 13-15.)

## DISCUSSION

### A. Liability

The Federal Rules of Civil Procedure prescribe a two-step process for a plaintiff to obtain a default judgment.  First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  FED. R. CIV. P. 55(a).  Second, after a default has been entered against the defendant, and the defendant fails to appear to move or set

3

aside the default under Rule 55(c), the court may, on a plaintiff's motion, enter a default judgment. FED. R. CIV. P. 55(b)(2).

Once a defendant is found to be in default, it is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). However, a court retains the discretion to determine whether a final default judgment is appropriate. Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993); see also Taylor v. 312 Grand St. LLC, No. 15 CV 5410, 2016 WL 1122027, at *3 (E.D.N.Y. Mar. 22, 2016) ("[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right.") (internal quotation marks and citations omitted). Thus, despite a defendant's default, the plaintiff bears the burden of demonstrating that the unchallenged allegations and all reasonable inferences drawn from the evidence establish the defendant's liability on each asserted cause of action. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

In this case, the SEC has established Bebida's liability because the complaint sufficiently alleges that Bebida violated multiple provisions of the federal securities laws and that Bebida received proceeds from those violations. Section 17(a) of the Securities Act prohibits fraudulent conduct, schemes, or practices in the offer or sale of securities. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit essentially the same conduct, if committed in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5. To establish a violation of these antifraud provisions, the SEC must show that the defendant: (1) acting with the requisite scienter, (2) engaged in market manipulation, made material misrepresentations, or otherwise engaged in a scheme or course of business to defraud others, (3) in the offer or sale, or in connection with the purchase or sale, of a security,

(4) by use of an instrumentality of interstate commerce, such as the mails or wires. See SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). Information is "material" if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision or if the information would significantly alter the total mix of available information. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). The Second Circuit has held that scienter may be established by proof of "conscious misbehavior or recklessness" on the part of the defendant. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001); SEC v. U.S. Envt'l., Inc., 155 F.3d 107, 111 (2d Cir. 1998); Sirota v. Solitron Devices, Inc., 673 F.2d 566, 573 (2d Cir. 1982). A showing of negligence is sufficient with respect to claims brought under sections 17(a)(2) and 17(a)(3) of the Securities Act. See, e.g., Aaron v. SEC, 446 U.S. 680, 697 (1976); Dale v. Prudential-Bache Sec., Inc., 719 F. Supp. 1164, 1166 (E.D.N.Y. 1989). The "in connection with" requirement is satisfied if the fraud coincides with a securities transaction. SEC v. Zandford, 535 U.S. 813, 822-24 (2002); Superintendent of Ins. of the State of N.Y. v. Bankers Life and Cas. Co., 404 U.S. 6, 12-13 (1971).

Here, the complaint alleges that Bebida, through Weber, employed a series of fraudulent schemes to acquire money, in violation of the federal securities laws. (Compl. ¶ 1). The fraudulent schemes described in the complaint fall into three categories:

1. The Sham DLR Convertible Debt

On January 5, 2015, defendants allegedly fabricated a secured convertible debenture in the amount of $180,000 purportedly issued on October 22, 2012 by Bebida to DLR Associates, LLC ("DLR"). (Id. ¶ 1.9) DLR, a privately held limited liability company, owned

5

all of the registered trademarks for the brands developed, manufactured, and marketed by Bebida. (Id. ¶ 14.) The DLR Convertible Debt was fictitious—the debenture did not previously exist and DLR never actually loaned Bebida $180,000. (Id. ¶ 19.) From January 7, 2015 through November 30, 2015, $45,475 of this purported $180,000 convertible debt was assigned to an entity called Warmick International Inc. ("Warmick") in ten separate assignments. (Id. ¶ 20.) Warmick was incorporated by Weber, who was also its president. (Id. ¶ 18.) With each assignment, Weber obtained an attorney opinion letter opining that the assigned debt could be converted into common shares issued to Warmick without restricted legend pursuant to Rule 144. (Id. ¶ 20.) The following false representations (among others) made by Weber on behalf of Bebida were the basis for such opinion letters: (1) the convertible debt was a true debt Bebida owed to DLR; (2) the convertible debt was issued on October 22, 2012; (3) DLR was not an affiliate of Bebida; (4) Warmick was not an affiliate of Bebida; and (5) Warmick was not selling on behalf of an affiliate of Bebida. (Id.) Weber also provided fraudulent documentation to the attorney concerning the purported DLR loan and disbursement requests directing payment of DLR by Warmick for the portion of debt assigned. (Id.)

After the attorney opinion letters were issued, Weber submitted the letters and supporting documents to the transfer agent, which issued certificates for common shares of Bebida to Warmick without a restricted legend. (Id. ¶ 21.) Weber then instructed a person referred to in the complaint as "Individual A" to deposit these shares into Warmick's brokerage accounts and to sell the shares. (Id.) The shares were sold within weeks after the purported debt assignment. (Id.) Individual A sent at least $168,000 of the total $195,039.43 (or nearly eightysix percent) in gross proceeds from the sale of the Bebida common stock back to Bebida, further demonstrating that Weber and Bebida, not Individual A and Warmick, were the true

beneficial holders of the stock resulting from the assignments of the DLR Convertible Note to Warmick.

(Id.; Genet Decl. ¶ 9, Ex. B).

### 2. The Fabricated Debt Paid by Shares

On or about December 30, 2014, Bebida executed a 100:1 reverse stock split, reducing its issued and outstanding shares by a factor of 100. (Compl. ¶ 22). Bebida issued a press release stating that the reverse split was "part of an overall long term initiative to send a clear message to the market that we are aggressively taking steps to end stock delusion [sic] and begin the tedious stock buy-back process." (Id.) One consequence of the reverse split, however, was that the number of shares a person could hold before being deemed an affiliate was also reduced by a factor of 100. (Id.) This meant that holders of convertible debt could convert a far smaller number of shares at any one time before being deemed affiliates. (Id.) This limitation resulted in higher expenses to Bebida because it had agreed to pay certain fixed costs associated with stock conversions by holders of Bebida convertible debt. (Id.) To avoid paying these costs, Bebida fraudulently increased the number of issued and outstanding shares. (Id. ¶ 23.) This correspondingly increased the number of shares that holders of Bebida convertible debt could convert into common shares at one time without being deemed affiliates. (Id.)

On April 13, 2015, Bebida issued 350 million shares to an unincorporated entity called First Beverage Investment LLC ("First Beverage"), purportedly in exchange for a working capital loan in the amount of $200,000 (the "First Beverage Issuance"). (Id.) First Beverage did not exist, and no such loan was made. (Id.) Then, as convertible debt issuances of Bebida common stock were made, Bebida "retired" the sham shares and instructed the Transfer Agent to reduce the stock certificate issued to First Beverage and return the cancelled shares to Bebida. (Id.)

7

Both Bebida's Quarterly Report for the period ending June 30, 2015 (the "Quarterly Report"), filed on September 29, 2015, and Supplemental Information filing for the period ending September 30, 2015 (the "Supplemental Filing"), filed on October 1, 2015, materially misrepresented the First Beverage Issuance. (Id. ¶ 25.) The Quarterly Report identified the First Beverage Issuance as a capitalization whereas, in truth, First Beverage provided no capital to Bebida. (Id.) The Supplemental Filing similarly falsely stated that the First Beverage Issuance was "for collateral in an Investment proposition," even though First Beverage had actually offered no "Investment proposition." (Id.) In addition, on at least two occasions, Bebida publicized the cancellation of the First Beverage shares through false press releases. (Id. ¶ 26). The press releases created the false impression that Bebida had repurchased the shares and that these repurchases were an indication that Bebida was in the process of buying back its stock from shareholders. (Id.)

The first press release, issued on May 12, 2015, reported that Bebida had "recovered and retired nearly 10 percent of the company's current issued and outstanding stock," in reference to the cancellation on that day of seventy-five million shares that had been issued to First Beverage. (Id. ¶ 27.) The second press release, issued on June 9, 2015, reported that Bebida had "recovered and retired 43,000,000 of the company's current issued and outstanding stock." (Id.) Both press releases quoted Weber as saying, "I am optimistic that our buy back will bring our stock price and OTC Markets view back into true focus and the loyal and long term investors have their day." (Id.) However, Bebida did not "buy back" the shares as it paid no money to redeem the shares—the shares were simply cancelled. (Id.)

The stock price of Bebida's common shares increased dramatically on the day of each press release. (Id. ¶ 28.) On May 11, 2015, Bebida's common stock had a high of $.0005/share and a closing price of $.0002/share. (Id.) On May 12, 2015, after the first press

8

release, the stock price had a high of $.0011/share, a 120 percent increase over the previous day's high, and a closing price of $.0007/share, a 250 percent increase over the previous day's closing price. (Id.)  On June 8, 2015, Bebida's common stock closed at a high price of $.0005/share. (Id.)  On June 9, 2015, after the second press release, the stock price had a high of $.0017/share, a 240 percent increase over the previous day's high, and a closing price of $.0006/share, a twenty percent increase over the previous day's closing price. (Id.)  3.

### The Additional Fabricated Notes

In December 2013 and October 2014, Weber fabricated two aged notes receivable, convertible into Bebida stock: a $200,000 convertible note purportedly issued on June 22, 2012 and a $100,000 convertible note purportedly issued on April 25, 2014. (Id. ¶ 30.)  Shortly after creating these notes, Weber arranged for their sale to Investor A for $40,000, paid by two checks of $20,000 each. (Id.)  From January 2014 to June 2015, Investor A converted the debt into common stock, ultimately holding over 940 million shares, and from January 2015 to September 2015, Investor A sold over 160 million shares of Bebida common stock to the public, generating approximately $61,000 in proceeds. (Id. ¶ 31).

Accepting these well-pleaded allegations as true, I find that plaintiff has met its burden of establishing Bebida's liability.  The facts alleged in the complaint show that Bebida, through Weber, made numerous false, material representations in the offer or sale of unregistered securities by use of the mails or wires.  I also find that the complaint alleges the requisite scienter.  I therefore respectfully recommend that Bebida be found liable for violations of Section 5 of the Securities Act.

B. Relief

1. Disgorgement

Disgorgement has long been viewed as an equitable remedy ordered "to deprive . . . defendants of their profits in order to remove any monetary reward for violating securities laws and to protect the investing public by providing an effective deterrent to future violations." Kokesh v. SEC, __ U.S. __, 137 S. Ct. 1635, 1640 (2017) (internal quotation marks and citations omitted). Courts have wide discretion to determine whether disgorgement is appropriate and the amount that should be disgorged. "In setting the disgorgement amount, a court must focus on the extent to which a defendant has profited from [its illegal conduct]." SEC v. Carrillo Huettel LLP, No. 13 CV 1735, 2017 WL 213067, at *7 (S.D.N.Y. Jan. 17, 2017), adopted in relevant part, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation, [and] any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) (internal quotation marks and citations omitted). Joint and several liability is permitted for disgorgement where two or more individuals or entities collaborate to violate federal securities laws. SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 288 (2d Cir. 2013); accord SEC v. Haligiannis, 470 F.Supp.2d 373, 385 (S.D.N.Y. 2007).

The SEC requests an order of disgorgement in the amount of $212,250. (Genet Decl. ¶¶ 8-16). This amount is comprised of: (1) $168,000 in profits made from the sales of Bebida stock issued pursuant to the sham convertible notes; (2) $4,250, which is the sum of the transfer-agent fees saved by Bebida from the artificial inflation of the number of Bebida shares; and (3) $40,000, which is the sum of the proceeds made by Bebida from the sales of the sham convertible debt. (Id.) Of the $212,250 that the SEC seeks in disgorgement from Bebida, it requests that Bebida be held jointly and severally liable with Weber for $208,000 (representing

the first and third components of the disgorgement). (Pl.'s Mem. at 16.) This is the amount of disgorgement that Weber was ordered to pay pursuant to his consent judgment, which provides that "[Weber's] liability for disgorgement and prejudgment interest will be joint and several with Defendant Bebida … should Bebida also be ordered to pay disgorgement and prejudgment interest thereon." (Id., Consent Judgment, Dkt. No. 11, ¶ VI). The remaining $4,250 of disgorgement is Bebida's alone, as it was a benefit that Bebida received, and the SEC did not seek to recover this amount from Weber.

I find that plaintiff has met its burden of justifying its request for $212,250 in disgorgement. I therefore respectfully recommend that Bebida be ordered to pay that amount, with Weber to be jointly and severally liable for $208,000.

2. Prejudgment Interest

The district court has "broad discretion in deciding whether to grant prejudgment interest on the disgorgement amount and, if such interest is granted, what rate should be used to calculate the amount." SEC v. Bocchino, No. 98 CV 7525, 2002 WL 31528472, at *3 (S.D.N.Y. Nov. 8, 2002) (quoting SEC v. Kenton Capital, Ltd., 69 F. Supp.2d 1, 16 (D.D.C. 1998)); see also Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 613 (2d Cir. 1994). The court's decision should rest on:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) consideration of fairness and the relative equities of the award, (iii) the remedial purposes of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

First Jersey Secs., 101 F.3d at 1476 (quoting Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 833-34 (2d Cir. 1992) (internal quotation marks omitted)). The district court generally calculates prejudgment interest by using the Internal Revenue Service ("IRS") rates for

11

underpayment of taxes under 17 U.S.C. § 201.600(b).  See, e.g., SEC v. Robinson, No. 00 CV 7452, 2002 WL 1552049, at *10 (S.D.N.Y. July 16, 2002).

The court has already ordered Weber to pay interest in the amount of $23,436.56, which included $18,067.89 for the DLR convertible debt fraud (calculated from the time of the final sale of stock issued pursuant to the fraudulent DLR convertible debt, August 1, 2015, through April 2018) and $5,368.67 for the additional fabricated notes fraud (calculated from the date of the payment for the second note through April 2018.)  (See Consent Judgment at 5.)  Plaintiff asks the court to order Bebida to pay this amount of prejudgment interest on a joint and several basis with Weber.  In addition, plaintiff requests that the court order Bebida to pay an additional $815.03 on an individual basis, which represents the interest on the additional benefit of $4,250 that Bebida received.[1]  I find this request reasonable and recommend that it be granted.

3. Civil Penalty

The federal securities laws permit courts to impose civil penalties for securities violations based on a three-tiered system.  See 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).  A first-tier penalty is appropriate for any violation; a second-tier penalty is appropriate for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty may be imposed if, in addition to the requirements for a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).[2]

---

[1]  Interest on the $4,250 was calculated from the date of the final conversion pursuant to a convertible note held while the First Beverage Issuance was outstanding, July 1, 2015 through June 30, 2019, the same date used for calculating Weber's prejudgment interest.  (Genet Decl. ¶ 13, Ex. G).

[2] See also Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission, U.S. Secs. & Exchange Comm'n, https://www.sec.gov/enforce/civilpenalties-inflation-adjustments.htm (last visited May 12, 2020).  For violations that occurred prior to November 3, 2015, the maximum first-tier penalty

Regardless of the appropriate tier, a court has the authority to impose a civil monetary penalty equal to the amount of "pecuniary gain" received by a defendant as a result of the violation, if that amount is greater than the listed statutory maximum. 15 U.S.C. §§ 77t(d)(2)(A)-(C), 78u(d)(3)(B)(i)-(iii). Unlike with disgorgement, a court may not impose a civil penalty on a joint and several basis. Pentagon Capital Mgmt., 725 F.3d at 288.

Beyond setting maximum penalties, the Acts leave the actual amount of the penalty to the court's discretion. SEC v. Razmilovic, 738 F.3d 14, 38 (2d Cir. 2013) (citation omitted); see also SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."). In exercising this discretion, a court may consider a number of factors, including:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

Carrillo Huettel, 2017 WL 213067, at *9 (internal quotation marks and citation omitted). The purpose of such civil penalties is to achieve "the dual goals of punishment of the individual violator and deterrence of future violations." SEC v. Coates, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (internal quotation marks omitted).

Plaintiff argues that Bebida's conduct warrants the imposition of maximum third-

---

for a defendant that is not a natural person is $80,000 per violation; the maximum second-tier penalty is $400,000; and the maximum third-tier penalty is $775,000. See 15 U.S.C. §§ 77t(d)(2)(A) – (C); 15 U.S.C. §§ 78u(d)(3)(B)(i) – (iii); 17 C.F.R. §§ 201.1001(a) – (b).

tier civil penalties "given the nature of the fraudulent conduct as well as the risk of substantial loss to investors." (Pl.'s Mem. at 18-19.) I note that Weber was ordered to pay a third-tier civil penalty (for a natural person) of $160,000. (See Consent Judgment.)

Plaintiff concedes that the numbers of Bebida's violative acts and defrauded investors are difficult to quantify in this case. (Pl.'s Mem. at 19-20.) However, the defendant should bear the burden of that uncertainty. Cf. SEC v. Contorinis, 743 F.3d 296, 306 (2d Cir. 2014) (discussing the "equitable principle that the wrongdoer should bear the risk of any uncertainty affecting the amount of the remedy"). Moreover, Bebida has offered no defense in this case, and therefore does not deny that its conduct involved fraud, deceit, and manipulation, as well as "deliberate or reckless disregard of a regulatory requirement," and created a significant risk of substantial losses. 15 U.S.C. § 78u(d)(3)(B)(iii). Given the undisputed allegations in the complaint and the civil penalty awarded in Weber's consent judgment, I find a third-tier penalty warranted here.

The inflation-adjusted maximum third-tier penalty for conduct by a defendant other than a natural person occurring at the time alleged in the complaint is $775,000. See Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission, U.S. Secs. & Exchange Comm'n, https://www.sec.gov/enforce/civilpenalties-inflation-adjustments.htm (last visited May 11, 2020). I therefore recommend that Bebida be ordered to pay a civil penalty of $775,000.

4. Permanent Injunction

In addition to monetary relief, a court may grant a permanent injunction on a motion for default judgment. E.g., SEC v. Baldassare, No. 11 CV 5970, 2014 WL 2465622, at *7 (E.D.N.Y. Apr. 15, 2014). The Acts each provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted" (15 U.S.C. §§ 77t(b), 78u(d)(1)),

and the court has broad authority to issue permanent injunctive relief when a defendant has violated securities laws and there is a reasonable likelihood that it will do so again.  Carrillo Huettel LLP, 2017 WL 213067, at *6; accord Baldassare, 2014 WL 2465622, at *7.  In assessing the likelihood of future violations, a court may consider:

> the fact that [the] defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether [the] defendant continues to maintain that [its] past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 100 (2d Cir. 1978) (citation omitted).

Here, many of these factors favor entry of a permanent injunction barring Bebida from violating federal securities laws.  Bebida's default limits the available evidence for the court to evaluate, but the uncontroverted allegations and evidence that have been presented in this litigation demonstrate that Bebida's activities were part of a knowing and continuous course of conduct.  It has been found liable for violations of federal securities laws, and scienter has been established.  (See Compl. ¶¶ 32-40.)  Bebida's "fraudulent past conduct gives rise to an inference of a reasonable likelihood of continued violations."  Baldassare, 2014 WL 2465622, at *16.  In addition, plaintiff states that, even though Bebida no longer has operations, "its stock has recently experienced several suspicious trading spikes in over the counter markets, which appear related to false information being disseminated online about the Company."  (Pl.'s Mem. at 1.)  Accordingly, I respectfully recommend that Bebida be enjoined from committing future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c), 77q(a)), Sections 10(b) and 15(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78o(a)), and Rule 10b-5 promulgated pursuant to the Exchange Act (17 C.F.R. § 240.10b-5).

## CONCLUSION

For the reasons stated above, I respectfully recommend that the SEC's motion for default judgment be granted and that defendant Bebida be ordered to pay $212,250 in disgorgement, with defendant Weber to be jointly and severally liable for $208,000 of that amount, plus $24,251.59 in prejudgment interest, with defendant Weber to be jointly and severally liable for $23,436.56 of that amount, and a civil penalty of $775,000.  I further recommend that Bebida be permanently enjoined from committing future violations of the Securities Act, the Exchange Act, and the rules promulgated thereunder.  Any objection to this Report and Recommendation must be filed electronically within fourteen (14) days.  Failure to file objections in a timely manner may waive a right to appeal the District Court's order.  See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(d), 72.

        Respectfully submitted,

        /s/
        ROBERT M. LEVY
        United States Magistrate Judge

Dated: Brooklyn, New York
May  26, 2020